This document was signed electronically on January 17, 2018, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: January 17, 2018



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION, AKRON

| | |
|---|---|
| In re: | Chapter 11 |
| The R.C.A. Rubber Company, | Case No. 16-52757 |
| *Debtor.* | Judge Alan M. Koschik |

AGREED ORDER
A) APPROVING BIDDING PROCEDURES FOR PROPOSED SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING AND
SCHEDULING AN AUCTION; (C) SCHEDULING HEARING FOR APPROVAL OF
THE SALE OF ASSETS FREE AND CLEAR OF LIENS AND THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES TO THE SUCCESSFUL BIDDER; (D) APPROVING PROCEDURES AND
SETTING DEADLINES FOR THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING CURE
AMOUNTS RELATING THERETO; (E) APPROVING CERTAIN DEADLINES AND
THE FORM, MANNER AND SUFFICIENCY OF NOTICE

This matter is before the Court upon motion of The R.C.A. Rubber Company, the

Debtor-in-Possession in the above-captioned case (the "Debtor"), moving this Court for an

entry of an order (a) approving bidding procedures for the proposed sale of substantially all of the Debtor's assets; (b) authorizing and scheduling an auction; (c) scheduling hearing for approval of the sale of assets free and clear of liens and the assumption and assignment of certain executory contracts and unexpired leases to the successful bidder; (d) approving procedures and setting deadlines for the assumption and assignment of executory contracts and unexpired leases, including cure amounts relating thereto; and (e) approving certain deadlines and the form, manner and sufficiency of notice (the "Motion").

The Court finds that:

     i.    The Court has jurisdiction over this Motion pursuant to 22 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

    ii.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

   iii.    The statutory predicates for the relief sought herein are Sections 105 and 363 of the Bankruptcy Code and Rules 2002(a), 6004, and 9014 of the Bankruptcy Rules.

   iv.    On November 18, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

    v.    The Debtor is currently operating its business as Debtor-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtor is a "small business debtor" as defined in Section 101 of the Bankruptcy Code.

   vi.    The Debtor is a corporation formed under the laws of the state of Ohio with its business operations being located at 1833 East Market Street, Akron, Ohio 44305.

  vii.    Notice of the Motion was served on all parties of interest purported to have an interest in the Assets.

viii. The relief granted herein is in the best interests of the Debtor, its estate, and other parties in interest.

ix. The Debtor has presented good and sufficient business reasons for the Court to (a) approve the Bidding Procedures, (b) approve the form and manner of the Sale Notice and the Assumption/Cure Notice, (c) approve the Assumption and Assignment Procedures, and (d) set the date of the Auction and the Sale Hearing.

x. Due, sufficient and adequate notice of the Bidding Procedures Hearing and the relief to be granted herein has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required. The Debtor's notice of the Motion, as it relates to the Sale Procedures, and the proposed entry of this Order is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, the Motion, as it relates to the Sale Procedures, or this Order and other matters addressed herein, is required.

xi. The Debtor's proposed notice of the Sale and proposed notice of amounts necessary to cure defaults under executory contracts and unexpired leases and of procedures to object to assumption and assignment of such executory contracts and unexpired leases are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale (and related deadlines and

dates), and no further notice of the Sale, the Auction, the Assumption and Assignment Procedures (including procedures for contesting any cure amount), the Bidding Procedures is necessary except as set forth herein.

xii. The Bidding Procedures, substantially in the form attached hereto as Exhibit 1, and incorporated herein by reference as if fully set forth in this Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtor's estate.

xiii. The Debtor has demonstrated a compelling and sound business justification for approving the Bidding Procedures and the Assumption and Assignment Procedures.

Upon consideration of the Court and for good cause shown it is THEREFORE ORDERED that:

a. The Motion is GRANTED, to the extent set forth herein.

b. Any objections filed in response to the Motion, to the extent relating to the Sales Procedures, and the relief granted herein not resolved as set forth herein or at the Sale Procedures Hearing, are hereby overruled.

c. The Bidding Procedures, as attached hereto as Exhibit 1, are approved. The Debtor is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures. The failure to specifically include or reference any particular provision, section or article of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety, except as modified herein.

d. Notice of this Order and Bidding Procedures shall be served by Debtor

within three (3) days of its entry upon the following parties:

    a.   the Office of the United States Trustee;

    b.   all parties who have expressed an interest in purchasing the Assets;

    c.   all other parties known by the Debtor to assert liens, claims, rights, interests, or encumbrances of record in any of the Assets;

    d.   all creditors of the Debtor;

    e.   all taxing authorities;

    f.   all government agencies; and

    g.   all other parties that have filed a notice of appearance and demand for service of papers in the bankruptcy case under Bankruptcy Rules 2002 and 9010(b).

e. The Sale Hearing shall be held on March 27, 2018 at 11:00 a.m. (prevailing Eastern Time).

f. Objections, if any, to the Sale, must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (c) be filed with the clerk of the Bankruptcy Court for the Northern District of Ohio on or before March 23, 2018 at 4:00 p.m. (prevailing Eastern Time) and be served upon: (1) counsel for the Debtor, Brennan, Manna & Diamond, LLC, 75 East Market Street, Akron, Ohio 44308, Attn: Michael A. Steel (masteel@bmdllc.com).

g. The Debtor is authorized to conduct an auction (the "Auction") with respect to the Assets. The Auction shall take place on March 16, 2018 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtor, Brennan, Manna & Diamond LLC, 75 East Market Street, Akron, Ohio 44308, or such other place and later date as the Debtor shall notify all Qualified Bidders and their counsel. In the event the date of the Auction is re-set to a later date, the Debtor shall file a notice of the new Auction date promptly following the decision to re-set such date. The Auction shall be conducted in accordance with the Bidding Procedures and the Debtor is authorized to take actions reasonably necessary to conduct and implement

the Auction. Subject to the participation limitations stated in the Bidding Procedures, the Auction will be conducted openly.

h.   Within Three (3) days of the conclusion of the Auction, the Debtor shall file a notice of the identity of the High Bidder and High Bidder Back-up and, at that same time, shall serve notice of the identity of the same by fax, email or overnight mail to all counterparties whose contracts are or may be assumed and assigned.

i.   The Debtor is hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established this Order.

j.   This Order shall be binding on the Debtor, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estate of the Debtor.

k.   Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

l.   This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the, the Form APA, the Bidding Procedures and the implementation of this Order.

m. A summary of the relevant dates and deadlines established by this

Order is as follows:

| March 9, 2018 at 5:00 p.m. EST | Bid Deadline - Due Date for Bids and Deposits |
|---|---|
| March 16, 2018 at 10:00 a.m. EST | Auction |
| March 19, 2018 at 5:00 p.m. | Deadline for Debtor to Announce Results of Auction |
| March 23, 2018 at 4:00pm | Deadline to file Objections to Sale |
| March 27, 2018 at 11:00 a.m. EST | Sale Hearing |

IT IS SO ORDERED.

###

SUBMITTED & APPROVED BY:
BRENNAN, MANNA & DIAMOND, LLC


*/s/ Michael A. Steel* _____
MICHAEL A. STEEL (#0072367)
75 East Market Street
Akron, Ohio 44308
PH:     (330)   374-7471
FX:     (330)   374-7472
masteel@bmdllc.com
*Attorney for Debtor*
APPROVED BY:


*/s/ Aditi Kumar*
STEPHANIE THOMAS
ADRIAN ZAREBA
ADITI KUMAR
HANNAH KAPLAN
Attorneys
Office of the General Counsel
Pension Benefit Guaranty Corporation
1200 K Street NW
Washington, D.C. 20005-4026
(202) 326-4020 ext. 3016
Fax: (202) 326-4112
Email: zareba.adrian@pbgc.gov *and*
        efile@pbgc.gov

*/s/ David M. Fusco*
David M. Fusco (0010387)
SCHWARZWALD McNAIR & FUSCO LLP
1215 Superior Avenue, Suite 225
Cleveland, OH 44114-3257
(216) 566-1600
(216) 566-1814 (facsimile)
dfusco@smcnlaw.com
*Attorneys for the United Steel, Paper and*
*Forestry, Rubber, Manufacturing, Energy,*
*Allied Industrial and Service Workers*
*International Union*

*/s/ Maria D. Giannirakis*
Maria D. Giannirakis
Office of the US Trustee
H.M. Metzenbaum US Courthouse
201 E. Superior Ave., Suite 441
Cleveland, OH 44114-1240

SERVICE LIST

NOTICES TO:
(via Regular US Mail)

The R.C.A. Rubber Company
1833 East Market St.
Akron, OH 44305

Office of the US Trustee
Howard M. Mentzenbaum US Courthouse
201 Superior Ave. E.
Suite 441
Cleveland, Ohio 44114

PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541

Pension Benefit Guaranty Corporation
Office of the Chief Counsel
1200 K Street NW
Washington, DC 20005

Aditi Kumar
Pension Benefit Guaranty Corporation
Office of the Chief Counsel
1200 K Street NW
Washington, DC 20005

Adrian Zareba
Pension Benefit Guaranty Corporation
1200 K Street NW
Washington, DC 20005-4026

Maria D. Giannirakis
Office of the US Trustee
H.M. Metzenbaum US Courthouse
201 E. Superior Ave., Suite 441
Cleveland, OH 44114-1240

David M. Fusco
Schwarzwald McNair & Fusco LLP
1215 Superior Ave., Suite 225
Cleveland, OH 44114

Michael A. Steel
Brennan, Manna & Diamond
75 East Market Street
Akron, OH 44308

(via ECF):

Maria D. Giannirakis, Office of the United States Trustee,
maria.d.giannirakis@usdoj.gov
Aditi Kumar, kumar.aditi@pbgc.gov
Adrian Zareba, zareba.adrian@pbgc.gov
Michael A. Steel, masteel@bmdllc.com
David M. Fusco, dfusco@smcnlaw.com

EXHIBIT 1
BIDDING PROCEDURES

**Bidding Procedures**

**A.       General**

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of substantially all of the assets (the "Assets") of The R.C.A. Rubber Company, debtor-in-possession in Case No. 16-52757 - AMK (the "Debtor").  These Bidding Procedures are being distributed in connection with the Debtor's Motion (the "Bid Procedures Motion") for Entry of Order: (A) Approving Bidding Procedures for Sale of Substantially All of the Debtor's Assets; (B) Authorizing and Scheduling an Auction; (C) Scheduling Hearing for Approval of the Sale of Assets Free and Clear of Liens and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to Successful Bidder (D) Approving Procedures and Setting Deadlines for the Assumption and Assignment of Executory Contracts and Unexpired Leases, Including Cure Amount Relating Thereto; (E) Approving Certain Deadlines and the Form, Manner and Sufficiency of Notice; and (F) Granting Other Related Relief.

On January ____, 2018, the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order") approving, incorporating, and authorizing, among other things, the implementation of these Bidding Procedures and scheduling a timeline for the sale of the Assets (the "Sale").

**B.       The Bidding Process**

Pursuant to the Bidding Procedures Order and the terms contained herein, the Debtor may conduct an auction (the "Auction") to sell the Assets to the person or entity

making the highest and best bid (the "High Bid" and such person or entity making such bid, the "High Bidder") or to the person or entity making next highest and best bid (the "High Back-up Bid" and such person or entity making such bid, the "High Back-up Bidder") for the Assets submitted in accordance with these Bidding Procedures provided the bid is a Qualified Bids (defined below) made by a Qualified Bidder (defined below). If only one Qualified Bids is received by the Debtor prior to the Bid Deadline, the Qualified Bid shall be deemed the High Bid for the purposes of the Sale Hearing (defined below). The Assets will only be offered and sold as a package and not individually.

The Debtor shall have the sole right, subject to the terms and conditions set forth herein to: (i) determine whether any person is a Qualified Bidder; (ii) determine whether any further due diligence investigation regarding the Assets shall be permitted and, if so, coordinate the efforts of potential bidders in conducting their respective due diligence investigations regarding the Assets; (iii) receive offers from Qualified Bidders; (iv) invite Qualified Bidders to any Auction; (v) negotiate any offer made to purchase the Assets; and (vi) determine the High Bid and the High Back-up Bid, subject only to Bankruptcy Court approval (collectively, clauses (i) through (vi) are the "Bidding Process").

Based upon the terms and conditions of the bids received from Qualified Bidders, the level of interest expressed by the bidders in the Assets, and such other information as the Debtor determines is relevant, the Debtor may conduct the Auction in the manner it determines will achieve the maximum value for the Assets including, but not limited to, offering the Assets for bidding in such successive rounds as the Debtor determines to be appropriate.

Any person that wishes to participate in the Bidding Process must be a Qualified

Bidder.  Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Qualified Bidder and the Debtor and its professionals shall use good faith efforts to provide all Qualified Bidders with substantially similar information.

      **C.**      **Required Bid Documents**

All bids must include the following to constitute a Qualified Bid (the "<u>Required Bid Documents</u>"):

1.      A written irrevocable offer that expressly states the terms of the offer, including the purchase price being offered for the Assets, with an acknowledgement that the purchase price shall be paid in immediately available U.S. funds at closing.  Any offer must include: (a) the full name and identity of the bidder; (b) the full name and identity of the bidder's broker (if any); and (c) an express statement that the bidder has read, understands, and agrees to be bound by and comply with these Bidding Procedures.  The foregoing shall apply to all bids made by any bidder or on behalf of any bidder by a broker.

2.      An acknowledgement by the bidder that the bidder agrees to and will be bound by all of the terms set forth in the form of APA attached to the Sale Motion as <u>EXHIBIT 2</u>, except for specifically enumerated proposed modifications (which in no event shall include a financing contingency).  Any modifications proposed by the bidder shall be clearly shown in a clean and blacklined version (a "<u>Marked APA</u>") of the APA signed by an individual authorized to bind the proposed bidder.  No bidder, shall be eligible for a breakup fee or reimbursement of expenses under the APA.  Subject to the first sentence of this paragraph, the Debtor reserves the right, where appropriate in its

business judgment, to modify the APA with any bidder by accepting reasonable changes as determined by the Debtor.

3.      A written expression of interest regarding the assumption or non-assumption of the R.C.A. Rubber Company Pension Plan ("Pension Plan"). If the Bidder wishes to assume all or part of the Pension Plan, the value of such assumed liability shall be considered by the Debtor.

4.      A written expression of interest regarding the hiring/future retention of a substantial portion of the Debtor's existing production and maintenance employees, which shall be considered by the Debtor.

5.      The payment, by wire transfer or certified check to Brennan, Manna & Diamond, LLC, as escrow agent for the Debtor (or such other escrow agent as may be appointed by the Debtor for such purpose), of a good faith deposit equal to at least 20% of the purchase price (the "Deposit").  Any party claiming a lien on the Assets and making a credit bid must submit a deposit based upon the full amount of the bid without regard to the amount of credit included within such bid.

6.      Written evidence of the bidder's financial ability acceptable to the Debtor to purchase the Assets in whole which evidences the bidder's ability to timely consummate the Sale and perform under the Marked APA and satisfy the requirements of section 363 of the Bankruptcy Code.  Such written evidence may include a written commitment for financing from a financial institution (but which shall not be a condition of closing), the bidder's current audited financial statement, the most recent quarterly report filed with the U.S. Securities and Exchange Commission, if the bidder is a public entity, or if the bidder is an entity formed for the purpose of acquiring the Assets, current

audited financial statements of the equity holders of the bidder, which persons and/or entities shall guarantee the performance of the bidder, and/or other form of financial disclosure acceptable to the Debtor and its representatives.

7.      A written list of each executory contract and unexpired lease the assumption and assignment of which is a condition to consummation of the Sale.

8.      If any bid is conditioned on the assumption and assignment of executory contracts or unexpired leases of real property, then such bidder shall be required to provide adequate assurance of future performance of such contracts or leases with the bid.

9.      If the bidder employs a broker, a disclosure of the identity of the broker and terms of the broker's proposed commissions.

10.      Written evidence that the bidder has obtained the requisite authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission of its bid, execution of the APA, and consummation of the transaction, or a representation that no such authorization or approval is required.

   **D.      Qualified Bids**

A "Qualified Bid" is a bid that includes each of the Required Bid Documents and:

(i)      is a bid for the Assets as a package, and NOT a bid for a portion of the Assets;

(ii)      is a binding irrevocable offer to purchase the Assets for cash only, with no contingencies to closing (other than the conditions set forth in the APA);

(iii)      has been timely received by each of the parties listed in the Section E below no later than the Bid Deadline or any extended Bid Deadline;

(iv)      states the bidder's intention regarding the Pension Plan;

(v)     states the bidder's intention regarding hiring/future retention of a substantial portion of the Debtor's existing production and maintenance employees;

(vi)    the bid must not be materially more burdensome or conditional than the terms of the APA;

(vii)   the bidder must establish that, in the Debtor's business judgment, the bidder has the ability and is reasonably likely to timely close on its proposed acquisition of the Assets if selected as the High Bid;

(viii)  is not subject to or conditioned on obtaining financing;

(ix)    is not conditioned on the outcome of unperformed due diligence;

(x)     does not entitle the bidder, to any termination or break-up fee, expense reimbursement, or similar type of payment;

(xi)    is a good faith, bona fide offer to purchase the Assets;

(xii)   is a Qualified Bid acceptable to the Debtor;

(xiii)  by its terms will remain open and irrevocable as set forth in Sections J and K until the earlier of: (i) the closing with respect to the High Bid or the High Back-Up Bid, as applicable; or (ii) 90 days after entry of the Order of the Bankruptcy Court approving the sale;

(xiv)   contains evidence satisfactory to the Debtor that the bidder is reasonably likely to obtain prompt regulatory approval, if required, to purchase the Assets; and

(xv)    is an amount of no less than $1,500,000.00 (the "Minimum Bid Amount").

Any person or entity that submits a Qualified Bid shall be a "Qualified Bidder."

### E.    Bid Deadline

To be considered a timely bid for consideration and potential for subsequent Auction, if needed (described below), written copies of its bid containing each of the Required Bid Documents (described above) must be delivered to: (i) the Debtor's financial advisor, Charles S. Deutchman, c/o Shared Management Resources, Ltd., 28026 Gates Mills Boulevard, Pepper Pike, Ohio 44124-4730, cdeutchman@shrmgtres.com; and (ii) the Debtor's counsel, Brennan, Manna & Diamond LLC, c/o Michael A. Steel 75 East Market Street, Akron, Ohio 44308, masteel@bmdllc.com ; SO THAT SUCH BID IS RECEIVED NO LATER THAN 5:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 9, 2018 (the "Bid Deadline"). The Debtor may, in its sole discretion, extend the Bid Deadline once or successively without further notice but is not obligated to do so.

The submission of a bid shall constitute an express consent by the bidder to the exclusive jurisdiction of the Bankruptcy Court to hear and determine all disputes relating to the bid, the Auction, and the Sale.

In the event that the Debtor determines in good faith that is has not received a Qualified Bid by the Bid Deadline that is in excess of the Net Liquidation Value for the Debtor's assets, the Debtor shall seek the approval of the court to commence a liquidation of the business assets.

### F.    Due Diligence

Each bidder must complete all required due diligence prior to the submission of its bid. Due diligence information can be obtained by contacting Debtor's financial advisor, Charles S. Deutchman, c/o Shared Management Resources, Ltd., 28026 Gates Mills Boulevard, Pepper Pike, Ohio 44124-4730, cdeutchman@shrmgtres.com. All bidders seeking due diligence information will be required to execute a Nondisclosure

and Confidentiality Agreement prior to the disclosure of such information. The Nondisclosure and Confidentiality Agreement will be provided to all bidders by Shared Management Resources, Ltd. upon request of due diligence information. The Debtor and Shared Management Resources, Ltd. shall not be obligated to furnish any due diligence information after the Bid Deadline or to any party that the Debtor determines, in their sole discretion, is not reasonably likely to be a Qualified Bidder.

### G.  Acceptance of Qualified Bids

The Debtor intends to sell the Assets to the Qualified Bidder who submits the High Bid at the Auction. The Debtor shall have accepted a bid] only when such bid has been approved by the Bankruptcy Court at the Sale Hearing. No bid shall be deemed rejected until such rejection is communicated in writing by the Debtor.

In evaluating whether any Qualified Bidder has submitted a higher and best bid, the Debtor may consider, among other things: (i) the number, type and nature of any changes to the APA as indicated on the Marked APA required by each bidder; (ii) the extent to which such modifications are likely to delay closing of the Sale to such bidder and the cost to the bankruptcy estate from such modifications or delay; (iii) the purchase price and the bidder's financial status; (iv) the probability of a prompt closing; (v) the assumption of the Pension Plan; and (vi) the hiring/future retention of a substantial portion of the Debtor's existing production and maintenance employees.

Subject to receipt of a signed Nondisclosure and Confidentiality Agreement, the Debtor shall provide PBGC and the United Steelworkers with all copies of what the Debtor has determined to be Qualified Bids at least three (3) calendar days prior to the date of the Auction.

### H.    Auction

If, on or before the Bid Deadline, the Debtor has received at least two Qualified Bids, the Debtor shall conduct an Auction with respect to the Assets.  The Auction shall take place on March 16, 2018, at 10:00 A.M. at the offices of Brennan, Manna & Diamond LLC, 75 East Market Street, Akron, Ohio 44308, or such other time and place to be designated by the Debtor in writing.  At the start of the Auction, the Debtor (or their agent(s) as the case may be), after consultation with the PBGC and the United Steelworkers, will announce the highest and best Qualified Bid, as determined by the Debtor in its sole discretion.  During the Auction, bidding shall begin initially with the highest and best Qualified Bid as determined by the Debtor.  The Debtor shall not consider any subsequent bid at the Auction unless the bid exceeds the previous highest bid by at least $10,000 (the "Bid Increment").

During the course of the Auction, the Debtor may inform the participants which Qualified Bid reflects, in the Debtor's view, the highest and best offer and, if such bid has been determined to be the highest and best offer entirely or in part because of the addition, deletion or modification of a provision or provisions in the APA or the applicable APA of the Qualified Bidder, as applicable, other than an increase in the cash purchase price, the value reasonably ascribed by the Debtor to such added, deleted or modified provision or provisions.

ONLY QUALIFIED BIDDERS THAT HAVE SUBMITTED QUALIFIED BIDS SHALL BE ELIGIBLE TO PARTICIPATE IN THE AUCTION.  THE DEBTOR RESERVES THE RIGHT, IN THE BEST INTEREST OF THE ESTATE, TO EXCLUDE ANY PARTY FROM PARTICIPATING IN OR BEING PRESENT AT THE AUCTION FOR ANY REASON THAT THE DEBTOR DETERMINES MAY

IMPACT NEGATIVELY UPON THE SUCCESS OF THE AUCTION OR THE DEBTOR'S BUSINESS.

The Auction may be adjourned in the Debtor' reasonable discretion. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to all Qualified Bidders.

At the conclusion of the Auction and no later than March 19, 2018 at 5:00 p.m., the Debtor will identify the High Bid and the High Back-Up Bid, each of which shall be bound to comply with the terms of their respective sale agreements. In determining the High Bid and the High Back-Up Bid, the Debtor will consider the value of assumption of the Pension Plan and the Qualified Bidder's retention of the existing production and maintenance employees, if applicable. Within three (3) business days of the conclusion of the Auction, the High Bidder and the High Back-Up Bidder shall supplement their Deposit by delivering to the escrow agent for the Debtor such additional immediately available funds as may be necessary so that their Deposit equals twenty percent (20%) of the High Bid.

      I.      **Sale Hearing**

After the Auction, the Debtor will seek the entry of an order authorizing and approving the Sale to the High Bidder and the High Back-Up Bidder (in the event the Sale to the High Bidder is unable to close) at the Sale Hearing which is scheduled for March 27, 2018 at 11:00 a.m., Courtroom of the Honorable Alan M. Koschik, United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, 2 South Main Street, Akron, Ohio 44308, or as soon thereafter as counsel may be heard. Following approval of the Sale to the High Bidder, if the High Bidder fails to

consummate an approved sale within 90 days after entry of the order approving the Sale to the High Bidder, the Debtor shall be authorized to consummate the Sale with the High Back-Up Bidder without further order of the Court.

### J. **Irrevocability Period**

THE HIGH BID AND THE HIGH BACK-UP BID ARE IRREVOCABLE AND SHALL REMAIN BINDING UPON THE BIDDERS UNTIL THE EARLIER OF: (I) THE CLOSING OF THE SALE TO THE HIGH BIDDER OR HIGH BACK UP BIDDER, AS APPLICABLE, OR (II) 90 DAYS AFTER ENTRY OF THE SALE ORDER.

### K. **Return of Deposit**

The Deposit of any Bidder that is the High Bid or the High Back-Up Bid will be held in escrow as provided in <u>Section C.3</u> above in a non-interest bearing trust account until the earlier of: (i) the closing of the High Bid or the High Back-Up Bid, as applicable, or (ii) 90 days after entry of an Order of the Bankruptcy Court approving the Sale, unless such bid is sooner expressly rejected in writing by the Debtor or the Debtor causes a termination of the applicable APA. Notwithstanding any other provisions in the Bidding Procedures, all deposits by parties that are not the High Bid or the High Back-Up Bid shall be returned within seven (7) days of the Auction by the Escrow Agent. If the High Bidder fails to consummate the Sale due to the breach by such party, the Debtor shall retain the Deposit as partial liquidated damages and have such other remedies as may be set forth in the breached APA, and the High Back-Up Bidder shall immediately proceed to closing with the Debtor.

### L. **"As Is" and "Where Is"**

The sale of the Assets shall be on an "As Is" and "Where Is" basis and without warranties or representations of any kind by the Debtor or their agents concerning the condition of the Assets, except to the extent set forth in the APA of the High Bidder. Except as provided in the APA, all of the Debtor' right, title and interest in and to the Assets shall be sold free and clear of all Encumbrances, if any, in accordance with sections 363 and 365 of the Bankruptcy Code, with such Encumbrances attaching to the net proceeds of Sale received by the Debtor, subject to any rights and defenses of the Debtor thereto and subject to further order of the Court.

By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that, except as otherwise set forth in the Qualified Bidder's APA, it has had an opportunity to inspect and examine the Assets and conduct any and all due diligence regarding the Assets prior to making its bid; that it has relied solely upon its own independent review, investigation and/or inspection of the Assets in making its bid; and that it did not rely upon or receive any written or oral statements, representation, promises, warranties or guarantees whatsoever, whether express, implied, by operation of law, or otherwise, with respect to the Assets, or the completeness of any information provided in connection with the Assets or the Auction, except as expressly stated in these Bidding Procedures.

## M. Expenses

Any bidders presenting bids shall bear their own expenses in connection with the bidding and sale process, whether or not such Sale is ultimately approved, in accordance with the terms of the APA.

## N. Debtor's Reservation of Rights

The Debtor , after consultation with the PBGC and the United Steelworkers,  may

in its sole discretion:  (a) determine, in its business judgment, which bid, if any, is the highest or best offer for the Assets; and (b) reject at any time before entry of an order by the Bankruptcy Court approving a successful bid, any bid that, in the Debtor's sole discretion, is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code; or (iii) contrary to the best interests of the Debtor, its estate, and/or its creditors. The Debtor must make these decisions in the best interest of the estate.

The Debtor shall have the right to adopt such other rules for the bidding process that, in its sole discretion, will better promote the goals of the bidding process. Notwithstanding any other provision in the Bidding Procedures to the contrary, in any event in which the Debtor shall exercise discretion, the Debtor shall make all decisions in the best interest of the estate and its creditors, with appropriate ethical protections and safeguards if insiders are bidding. Any insider bidding should be met with heightened scrutiny, and no insider party that submits a bid, and no advisers to such party in such capacity, shall consult with Debtor regarding another bid.

**<u>EXHIBIT 2</u>**
**ASSET PURCHASE AGREEMENT**

# <u>ASSET PURCHASE AGREEMENT</u>

between

## THE R.C.A. RUBBER COMPANY

Seller

and

_____

Buyer

dated as of

JANUARY \_\_, 2018

# TABLE OF CONTENTS

**ARTICLE I**        **DEFINITIONS** ..................................................................................................1

**ARTICLE II**        **PURCHASE AND SALE** ...................................................................................8

    **Section 2.01**    **Purchase and Sale of Assets.** ...................................................................8

    **Section 2.02**    **Excluded Assets** .......................................................................................9

    **Section 2.03**    **Assumed Liabilities** ...............................................................................10

    **Section 2.04**    **Excluded Liabilities** ...............................................................................11

    **Section 2.05**    **Assignment of Contracts** ........................................................................12

    **Section 2.06**    **Purchase Price** ........................................................................................12

    **Section 2.07**    **Purchase Price Adjustment.** ..................................................................13

    **Section 2.08**    **Allocation of Purchase Price** .................................................................14

**ARTICLE III**        **CLOSING** .......................................................................................................15

    **Section 3.01**    **Closing** ....................................................................................................15

    **Section 3.02**    **Closing Deliverables.** .............................................................................15

**ARTICLE IV**        **REPRESENTATIONS AND WARRANTIES OF SELLER** ...................................16

    **Section 4.01**    **Organization and Qualification of Seller** ...............................................16

    **Section 4.02**    **Authorization and Validity** .....................................................................16

    **Section 4.03**    **No Conflicts; Consents** ...........................................................................16

    **Section 4.04**    **Financial Statements** ..............................................................................17

    **Section 4.05**    **Title to Purchased Assets** .......................................................................17

**ARTICLE V**        **REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS OF BUYER** ...................................................................................................17

    **Section 5.01**    **Organization of Buyer** ...........................................................................17

    **Section 5.02**    **Authority of Buyer** .................................................................................17

    **Section 5.03**    **No Conflicts; Consents** ...........................................................................17

    **Section 5.04**    **Brokers** ...................................................................................................17

    **Section 5.05**    **Legal Proceedings** ..................................................................................17

    **Section 5.06**    **Buyer Broker Fees** .................................................................................17

    **Section 5.07**    **No Known Breach by Seller** ...................................................................17

Section 5.08    **Acknowledgement Purchased Assets Acquired "AS IS"** ........................................17

Section 5.09    **Availability of Funds** ..........................................................................................18

Section 5.10    **No Other Representations or Warranties of Seller** ............................................18

**ARTICLE VI    ACTIONS PRIOR TO CLOSING DATE** ....................................................**18**

Section 6.01    **Investigation of the Business by Buyer.** ..............................................................18

Section 6.02    **Operations Prior to the Closing Date** ................................................................19

Section 6.03    **Third Party Consents** .........................................................................................19

Section 6.04    **Governmental Approvals** ....................................................................................19

Section 6.05    **Non-competition** .................................................................................................20

Section 6.06    **Notice of Developments** .....................................................................................20

**ARTICLE VII    ADDITIONAL AGREEMENTS** .................................................................**20**

Section 7.01    **Taxes** ...................................................................................................................21

Section 7.02    **Collections after Closing** ....................................................................................21

Section 7.03    **Employee Matters** ..............................................................................................21

Section 7.04    **Post-Closing Cooperation and Access to Books and Records** ...............................22

Section 7.05    **Post-Closing Tax Returns** ..................................................................................22

Section 7.06    **Indemnification by Seller** ..................................................................................22

Section 7.07    **Indemnification by Buyer** ..................................................................................23

Section 7.08    **Limitations to Indemnification** ..........................................................................23

Section 7.09    **Indemnification Procedure** ................................................................................23

Section 7.10    **Tax Treatment of Indemnification Payments** ....................................................23

Section 7.11    **Waiver of Bulk Sales Act** ...................................................................................23

Section 7.12    **Further Assurances** ...........................................................................................24

**ARTICLE VIII    CONDITIONS TO CLOSING** ..................................................................**24**

Section 8.01    **Bankruptcy Conditions** .....................................................................................24

Section 8.02    **Conditions to Obligations of Buyer** ...................................................................26

Section 8.03    **Conditions to Obligations of Seller** ...................................................................27

**ARTICLE IX    TERMINATION AND OTHER REMEDIES** ............................................**28**

Section 9.01    **Termination** ........................................................................................................28

Section 9.02    **Effect of Termination** .........................................................................................29

**ARTICLE X      MISCELLANEOUS** .................................................................................................**29**

**Section 10.01  Confidential Nature of Obligations** ........................................................29

**Section 10.02  Survival** ...............................................................................................30

**Section 10.03  Expenses** .............................................................................................30

**Section 10.04  Notices** ...............................................................................................30

**Section 10.05  Interpretation** ......................................................................................31

**Section 10.06  Headings** .............................................................................................31

**Section 10.07  Severability** .........................................................................................31

**Section 10.08  Entire Agreement** ................................................................................31

**Section 10.09  Assignment** ..........................................................................................31

**Section 10.10  No Third-Party Beneficiaries** ..............................................................32

**Section 10.11  Amendment and Modification; Waiver** ..................................................32

**Section 10.12  Governing Law; Jurisdiction; Waiver of Jury Trial** ..............................32

**Section 10.13  Counterparts** ......................................................................................32

**Section 10.14  Time of Essence** .................................................................................32

**Section 10.15  Disclosure Schedules** .........................................................................32

**Section 10.16  No Recourse** .......................................................................................32

**DISCLOSURE SCHEDULES TO ASSET PURCHASE AGREEMENT:**

| | |
|---|---|
| **Schedule 2.01(a)** | **- Permitted Encumbrances** |
| **Schedule 2.01(a)(iii)** | **- Contracts, Leases and Intellectual Property Licenses** |
| **Schedule 2.01(a)(v)** | **- Intellectual Property Assets** |
| **Schedule 2.01(a)(vi)** | **- Tangible Personal Property** |
| **Schedule 2.01(a)(vii)** | **- Owned Real Estate and Leased Real Estate** |
| **Schedule 2.01(a)(viii)** | **- Permits (including Environmental Permits)** |
| **Schedule 2.02** | **- Excluded Assets** |
| **Schedule 2.03** | **- Assumed Liabilities** |
| **Schedule 2.05(b)** | **- Assigned Contracts** |
| **Schedule 2.07(a)(i)** | **- Closing Net Asset Statement** |
| **Schedule 4.01** | **- Jurisdictions** |
| **Schedule 7.03** | **- Excluded Employees** |

**EXHIBITS TO ASSET PURCHASE AGREEMENT:**

| | |
|---|---|
| **EXHIBIT A** | **- Bidding Procedures Motion and Order** |
| **EXHIBIT B** | **- Escrow Agreement** |
| **EXHIBIT C** | **- Bill of Sale** |
| **EXHIBIT D** | **- Sale Order** |

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of _____ __, 2018, is entered into by and between **THE R.C.A. RUBBER COMPANY**, an Ohio corporation ("**Seller**"), and _____ Company, a _____ corporation ("**Buyer**"). Seller and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties.**"

## RECITALS

**WHEREAS**, Seller is engaged in the business of manufacturing and selling customized industrial Rubber Flooring products (the "**Business**"); and

**WHEREAS**, on November 18, 2016 (the "**Petition Date**"), Seller commenced a case (the "**Bankruptcy Case**") under Chapter 11 of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**"), 11 U.S.C. §§ 101 *et seq.*, by filing a voluntary petition in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division (the "**Bankruptcy Court**"), Case no. 16-52757 AMK; and

**WHEREAS**, since the commencement of the Bankruptcy Case, Seller has continued in possession of its property and has continued to operate and manage its Business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all of the assets, and assume certain specified liabilities, of the Business, all in the manner and subject to the terms and conditions set forth in this Agreement, the Bidding Procedures Order (as defined below), and the Sale Order (as defined below), and in accordance with sections 105, 363 and 365 of the Bankruptcy Code.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Accounts Receivable**" has the meaning set forth in **Section 2.01(a)(i)**.

"**Action**" means any legal action, cause of action, lawsuit, or arbitration, or any inquiry, proceeding or investigation by or before any Governmental Authority.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Allocation Schedule**" has the meaning set forth in **Section 2.08**.

"**Alternative Transaction**" has the meaning set forth in **Section 8.01(b)**.

"**Assigned Contracts**" has the meaning set forth in **Section 2.01(a)(iv)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" has the meaning set forth in **Section 8.01(b)(iii)**.

"**Avoidance Claims**" means any and all causes of action, claims, rights and remedies, existing or arising under the Bankruptcy Code or applicable non-bankruptcy law for the avoidance of or recovery for

preferential transfers or fraudulent conveyances including, without limitation, any and all present and future claims and causes of action arising under Chapter 5 of the Bankruptcy Code.

"**Akron Facility**" means the Owned Real Property of Seller located at 1833 East Market Street, Akron, Ohio.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals

"**Benefit Plan**" means any and all benefit, retirement, compensation, profit-sharing, deferred compensation, incentive, performance award, phantom equity, stock-based, change in control, retention, severance, paid time off, fringe-benefit and other similar agreements, plans, policies, programs or arrangements, in each case whether or not reduced to writing and whether funded or unfunded, whether or not an "employee benefit plan" within the meaning of § 3(3) of ERISA, whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or an ERISA Affiliate of Seller for the benefit generally of current employees, officers, directors, retirees, independent contractors or consultants of the Business or spouses or dependents of any of the foregoing, or under which Seller has or may have any Liability.

"**Bid Deadline**" has the meaning set forth in **Section 8.01(b)(i)(B)**.

"**Bidding Procedures Motion**" means the motion to be filed with the Bankruptcy Court by Seller, substantially in the form of **Exhibit A** attached hereto, seeking approval of the establishment of bidding procedures as contemplated pursuant to **Article VIII**.

"**Bidding Procedures Order**" means an Order or Orders, substantially in the form of **Exhibit A** attached hereto, entered by the Bankruptcy Court granting the Bidding Procedures Motion and approving the bidding procedures relating to the sale of the Business assets as contemplated pursuant to **Article VIII**.

"**Bill of Sale**" has the meaning set forth in **Section 3.02(a)(ii)**.

"**Books and Records**" has the meaning set forth in **Section 2.01(a)(xi)**.

"**Business**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Akron, Ohio are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Buyer Indemnitees**" has the meaning set forth in **Section 7.06**.

"**Buyer Termination Notice**" has the meaning set forth in **Section 9.01(c)(ii)**.

"**Cash Consideration**" has the meaning set forth in **Section 2.06**.

"**Closing**" has the meaning set forth in **Section 3.01**.

"**Closing Date**" has the meaning set forth in **Section 3.01**.

"**Closing Net Asset**" means: (a) the Accounts Receivables and Inventory of the Business to the extent included in the Purchased Assets, determined as of the close of business on the Closing Date.

"**Closing Net Asset Statement**" has the meaning set forth in **Section 2.07(a)(i)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Consent Pending Contract**" has the meaning set forth in **Section 2.05(b)**.

"**Contracts**" means any and all legally binding agreements, commitments, contracts, indentures, instruments, Leases, licenses, and other obligations or undertakings, whether written or oral.

"**Copyrights**" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

"**Cure Costs**" has the meaning set forth in **Section 2.05(a)**.

"**Deposit**" has the meaning set forth in **Section 2.06(a)**.

"**Deposit Agent**" has the meaning set forth in **Section 2.06(a)**.

"**Deposit Escrow Agreement**" has the meaning set forth in **Section 2.06(a)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Disputed Amounts**" has the meaning set forth in **Section 2.07(b)(iii)**.

"**Dollars or $**" means the lawful currency of the United States.

"**Domain Names**" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet. A Domain Name may or may not also be a Trademark.

"**Eligible Employees**" has the meaning set forth in **Section 7.03(a)**.

"**Employee Records**" means any and all books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel, including, without limitation, books, files and records that relate to medical history, medical insurance or other medical matters and to workers' compensation, and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller.

"**Encumbrance**" means any lien under section 101(37) of the Bankruptcy Code and any other charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.*; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 *et seq.*; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33

3

U.S.C. §§ 1251 *et seq.*; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 *et seq.*; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 *et seq.*; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 *et seq.*; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 *et seq.*

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to any Person, any other Person that, together with such first Person, would be treated as a single employer, within the meaning of sections 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means the entity agreed between the Parties to serve as escrow agent under the Escrow Agreement.

"**Escrow Agreement**" means the Escrow Agreement among Buyer, Seller and the Escrow Agent, to be executed and delivered at the Closing in the form attached hereto as **Exhibit B**.

"**Escrow Amount**" means the sum of 20% of the Qualified Bid to be deposited with the Escrow Agent and held in escrow pursuant to the Escrow Agreement.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Contracts**" has the meaning set forth in **Section 2.02(c)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.04**.

"**Expense Reimbursement**" has the meaning set forth in **Section 8.01(a)**.

"**Extraordinary Events**" means (a) acts of God; (b) flood, fire, earthquake or explosion; and (c) war, invasion, hostilities, terrorist threats or acts, riot or other civil unrest.

"**Financial Statements**" has the meaning set forth in **Section 4.04**.

"**GAAP**" means United States generally accepted accounting principles and, to the extent that options exist under those principles, then consistent with those accounting methods, practices, principles and policies historically applied by Seller.

"**Governmental Authority**" means any federal, state, local, foreign or other government, or any agency or instrumentality of such government or political subdivision, any multinational organization or body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law or which is exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority power or authority), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Indemnified Party**" has the meaning set forth in **Section 7.09**.

"**Indemnifying Party**" has the meaning set forth in **Section 7.09**.

"**Independent Accountants**" has the meaning set forth in **Section 2.07(b)(iii)**.

4

"**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: (a) Trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered or unregistered, and all registrations and applications for registration of such Trademarks, including intent-to-use applications, all issuances, extensions and renewals of such registrations and applications and the goodwill connected with the use of and symbolized by any of the foregoing; (b) internet Domain Names, whether or not Trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all Copyrights (whether registered or unregistered), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; (e) Patents, patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications; and (f) all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing.

"**Intellectual Property Assets**" means all Intellectual Property owned by Seller, used in or necessary for the operation of the Business as currently conducted.

"**Intellectual Property Licenses**" means all licenses, sublicenses and other agreements by or through which other Persons, grant Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property Assets.

"**Interim Balance Sheet**" means the balance sheet of the Business as of October 31, 2017.

"**Interim Balance Sheet Date**" means the date of the Interim Balance Sheet.

"**Inventory**" has the meaning set forth in **Section 2.01(a)(ii)**.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" means all real property which is subject to a Lease, pursuant to which Seller occupies real property used in the operation of the Business.

"**Leases**" means all leases and other occupancy agreements for Leased Real Property.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Material Adverse Condition**" means any fact, condition, change, violation, inaccuracy, circumstance, condition or event ("**MAC**"), individually or in the aggregate, that has, or is reasonably likely to have, a material adverse condition on the Purchased Assets or the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole; *provided, however,* that "Material Adverse Condition" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Material Adverse Condition: (a) events or conditions that generally affect the industry in which Seller operates; (b) general business or economic conditions; (ci) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack; (d) the conditions of any financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (e) changes in GAAP; (f) acts or omissions of Seller carried out (or omitted to be carried out) in accordance with this Agreement; (g) any MAC caused by events, changes or developments relating to the transactions contemplated by this Agreement or the announcement thereof; or (h) any condition arising by reason of commencement of the Bankruptcy Case or Seller operating as a debtor in possession thereunder; unless, in the case of clause (a), (b), (c), (d) or (e) above only, such MAC would

5

reasonably be expected to result in a materially disproportionate adverse effect on, or change in, the Business, taken as a whole, relative to the businesses of other comparable companies in the industries in which the Business operates.

"**Non-Assured Contracts**" has the meaning set forth in **Section 8.01(e)(iv)**.

"**Non-Recourse Party**" has the meaning set forth in **Section 10.16**.

"**Ordinary Course of Business**" means the ordinary and usual course of day-to-day operations of the Business through the date hereof consistent with past practice.

"**Owned Real Property**" means all real property owned by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto).

"**Party**" has the meaning set forth in the preamble to this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Patents**" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from any Governmental Authority.

"**Permitted Encumbrances**" means (a) statutory liens for current property Taxes and assessments not yet due and payable or being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Seller; (b) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto; (c) Encumbrances that constitute or secure Assumed Liabilities (including Encumbrances arising under the Assigned Contracts); (d) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees; (e) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate Proceedings; (f) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the Leased Real Property, which would not have a Material Adverse Condition; and (g) the Encumbrances listed in **Section 2.01(a)** of the Disclosure Schedules.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Post-Closing Adjustment**" has the meaning set forth in **Section 2.07(a)(ii)**.

"**Purchase Price**" has the meaning set forth in **Section 2.06**.

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Qualified Bid**" has the meaning set forth in **Section 8.01(b)(i)**.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor),

6

surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Requested Party**" has the meaning set forth in **Section 7.04(b)**.

"**Resolution Period**" has the meaning set forth in **Section 2.07(b)(ii)**.

"**Review Period**" has the meaning set forth in **Section 2.07(b)(i)**.

"**Sale Hearing**" means the hearing or hearings held by the Bankruptcy Court to consider the transactions contemplated by this Agreement.

"**Sale Motion**" means the motion to be filed with the Bankruptcy Court by Seller, seeking (a) approval of the terms and provisions of this Agreement, (b) authorization for (i) the sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code and (ii) the assumption and assignment of the Purchased Assets that are executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, and (c) any other provisions acceptable to Buyer.

"**Sale Order**" has the meaning set forth in **Section 8.01(d)**.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller Indemnitees**" has the meaning set forth in **Section 7.07**.

"**Seller Termination Notice**" has the meaning set forth in **Section 9.01(d)(i).**

"**Starting Auction Bid**" has the meaning set forth in **Section 8.01(b)(iii)**.

"**Statement of Objections**" has the meaning set forth in **Section 2.07(b)(ii)**.

"**Tangible Personal Property**" has the meaning set forth in **Section 2.01(a)(vi)**.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Territory**" means North America.

"**Trademarks**" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names (including all assumed or fictitious names under which the Business is conducted), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"**Transaction Documents**" means this Agreement, the Deposit Escrow Agreement, the Escrow Agreement, the Bill of Sale, and the other agreements, instruments and documents required to be delivered at the Closing.

"**Transfer**" has the meaning set forth in **Section 2.05(b)**.

"**Transfer Taxes**" means any and all sales, documentary, excise, use, transfer and other similar Taxes (excluding any Taxes imposed on the basis of income, profit or gross receipts of the Business) that are incurred or imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets to Buyer. For the

avoidance of doubt, Transfer Taxes excludes all taxes incurred or imposed by reason of the sale, transfer, assignment and delivery of any assets other than the Purchased Assets or pursuant to any transactions other than the transaction contemplated in this Agreement.

"**Transferred Employees**" has the meaning set forth in **Section 7.03(a)**.

"**Undisputed Amounts**" has the meaning set forth in **Section 2.07(b)(iii)**.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses, as amended from time to time.

# ARTICLE II
# PURCHASE AND SALE

Section 2.01        **Purchase and Sale of Assets.**

(a)        Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in, to and under the Purchased Assets on a "AS IS" and "WHERE IS" basis, WITH ALL FAULTS and, except as otherwise specifically set forth in this Agreement, with NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER (EXPRESS OR IMPLIED), INCLUDING NO REPRESENTATIONS AS TO MERCHANTABILITY, FITNESS OR USE FOR A PARTICULAR PURPOSE; *provided, however*, the Purchased Assets shall be free and clear of any Encumbrances (other than Permitted Encumbrances and as listed on **Section 2.01(a)** of the Disclosure Schedules) to the extent permissible under section 363(f) of the Bankruptcy Code.  The term "**Purchased Assets**" means all of Seller's right, title and interest in, to and under all of the assets, properties and rights (other than Excluded Assets) of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired, owned, leased, licensed or used or held for use in or relating to the operation of the Business as of the Closing Date, but in all cases only to the extent same are transferrable or assignable by Seller pursuant to their terms, sections 363 or 365 of the Bankruptcy Code, or other applicable Law.  Without limiting the generality of the foregoing, the Purchased Assets include, without limitation, the following:

(i)        all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**");

(ii)        all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("**Inventory**");

(iii)        all Contracts, Leases and Intellectual Property Licenses to which Seller is a party, including all Leases and Intellectual Property Licenses listed on **Section 2.01(a)(iii)** of the Disclosure Schedules, but excluding Contracts, Leases and Intellectual Property Licenses excluded from assignment pursuant to **Section 2.01(b)**;

(iv)        all Contracts, Leases and Intellectual Property Licenses made or entered into after the date hereof by Seller with respect to the Business in the ordinary course not in violation of this Agreement and not excluded from assignment pursuant to **Section 2.01(b)** (the Contracts described in **Section 2.01(a)(iii)** and **Section 2.01(a)(iv)** being hereinafter defined as the "**Assigned Contracts**");

(v)        all Intellectual Property Assets, including those listed on **Section 2.01(a)(v)** of the Disclosure Schedules;

(vi)        all furniture, fixtures, equipment, machinery, tools, spare parts, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "**Tangible Personal Property**"), including the property listed on **Section 2.01(a)(vi)** of the Disclosure Schedules except as consumed, sold, used or disposed of in the Ordinary Course of Business;

(vii)     all Owned Real Property and Leased Real Property, including the property listed on **Section 2.01(a)(vii)** of the Disclosure Schedules;

(viii)     all Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, including those described in **Section 2.01(a)(viii)** of the Disclosure Schedules;

(ix)     all rights relating to deposits, prepaid expenses and claims for refunds, rebates and credits, and all rights of offset in respect thereof, that are not Excluded Assets;

(x)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(xi)     to the extent permitted by applicable Law, originals, or where not available, copies, of all books and records, including, without limitation, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licenses ("**Books and Records**"); but excluding Books and Records relating to Excluded Assets and Employee Records (other than for employees hired or retained by Buyer); however, Seller agrees to provide reasonable access to any books and records not conveyed hereunder or retained by the Seller;

(xii)     all goodwill, the going concern value of the Business, and all other intangibles of the Business.

(b)     At any time before the earlier of the date the Sale Order is entered or ten (10) Business Days prior to the Closing, Buyer, in its discretion by written notice to Seller, may exclude from being assigned pursuant to this Agreement and the Sale Order any Contract or Lease, and, in such circumstances, such Contracts or Leases shall not constitute Assigned Contracts (and shall constitute Excluded Assets), and Buyer shall not acquire any rights or assume any Liabilities with respect thereto.  Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to exclude from being assigned any Contracts or Leases pursuant to the preceding sentence.

(c)     Upon Buyer's reasonable request, Seller shall provide additional information as to the Liabilities under the Contracts and Leases sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contracts or Leases hereunder.

**Section 2.02     Excluded Assets.**  Notwithstanding anything in **Section 2.01** to the contrary, nothing in this Agreement shall be deemed to sell, transfer, assign or convey (or require Seller to do any of the foregoing as to) the following assets to Buyer, and Seller shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following assets existing as of the Closing Date (collectively, the "**Excluded Assets**"):

(a)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits;

(b)     all bank accounts of Seller;

(c)     all Contracts that are not Assigned Contracts (the "**Excluded Contracts**");

(d)     the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(e)     all Avoidance Claims (including Actions relating thereto), all rights, claims or causes of action of Seller against third parties relating to the Excluded Assets, and all rights, claims and causes of action of Seller against former officers, directors, employees, members, principals, agents, and representatives of

9

Seller arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date;

(f)     all shares of capital stock or other equity interests of Seller, or any securities convertible into, exchangeable or exercisable for share of capital stock or other equity interests of Seller;

(g)     all Benefit Plans and assets attributable thereto;

(h)     all rights, claims and causes of action which accrue or will accrue to Seller under the Transaction Documents;

(i)     all Employee Records (other than for those employees hired or retained by Buyer);

(j)     all retainers paid by Seller to professionals including, without limitation, accountants, attorneys and other consultants and advisors, in connection with the Bankruptcy Case or the transactions contemplated by this Agreement;

(k)     the Purchase Price delivered (or required to be delivered) to Seller pursuant to this Agreement; and

(i)     all other assets listed or described on **Section 2.02** of the Disclosure Schedules.

**Section 2.03     Assumed Liabilities.**  Subject to the terms and conditions set forth herein, at the Closing, effective as of the Closing, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)     all Liabilities arising after the Closing with respect to the Purchased Assets or the operation of the Business following Closing;

(b)     all Liabilities under the Leases of Leased Real Property and under the other Assigned Contracts;

(c)     all Cure Costs and other obligations under section 365 of the Bankruptcy Code to provide adequate assurance of future performance with respect to Assigned Contracts;

(d)     any Liabilities for remediation activities required under Environmental Laws, to the extent arising out of or relating to the existence or Release of Hazardous;

(e)     all other Liabilities set forth in **Section 2.03** of the Disclosure Schedules.

**Section 2.04     Excluded Liabilities.**  Notwithstanding any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, without limitation, the following:

(a)     any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Bidding Procedures Motion, the Bidding Procedures Order, the Sale Motion, the Sale Order, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)     all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date;

(c)     any Liabilities relating to or arising out of the Excluded Assets;

(d)     other than as specifically set forth herein, any Liabilities relating to any events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) including all pending or threatened Actions relating thereto;

10

(e)      any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(f)      any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(g)      any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(h)      except as set forth in **Section 2.03(a)**, any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments (or that become owing to such employees upon the termination of their employment including all Liability arising under the WARN Act);

(i)      except as set forth in **Section 2.03(d)**, any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(j)      any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the Ordinary Course of Business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(k)      any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to **Section 7.07** as Seller Indemnitees;

(l)      any Liabilities under the Excluded Contracts;

(m)      any pension or retirement Liabilities of Seller to its current or former employees which are accrued as of the Closing Date, whether or not under any Benefit Plan;

(n)      any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions;

(o)      any Liabilities arising out of, in respect of or in connection with the failure by Seller to comply with any Law or Governmental Order; and

Section 2.05      **Assignment of Contracts.**

(a)      Seller shall assume and assign all Assigned Contracts to Buyer as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order. In connection with such assumption and assignment, Seller shall provide to all non-debtor parties to Assigned Contracts, and the Sale Order shall find that the Seller provided, timely and proper written notice of the procedures for assumption and assignment thereof by Seller, including proposed amounts necessary to cure all monetary defaults under such Assigned Contracts and to compensate for all actual or pecuniary losses resulting from such defaults to the extent required by section 365(b) of the Bankruptcy Code (such amounts, the "**Cure Costs**"). Seller shall take all other actions reasonably necessary to cause all Assigned Contracts to be assumed by Seller and assigned to Buyer pursuant to section 365 of the Bankruptcy Code, although it is understood that Buyer shall pay the Cure Costs (and the Purchase Price will be reduced by the amount of such Cure Costs as a result of the Post-Closing Adjustment) and provide adequate assurance of future performance to the extent required by section 365 of the Bankruptcy Code.

(b)      To the extent that any Contract or Lease to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "**Transfer**") to Buyer pursuant to the terms hereof is not capable of being Transferred to Buyer (after giving effect to the Sale Order) without the Consent of a third Person (each

11

such Contract or Lease, a "**Consent Pending Contract**"), or if such Transfer or attempted Transfer would, or if the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Law, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer will have been obtained unless an Order of the Bankruptcy Court effects such Transfer without Consent, Buyer may elect in its sole and absolute discretion, exercisable until the earlier of the date the Sale Order is entered or ten (10) Business Days prior to the Closing, to (i) exclude such Consent Pending Contract from the Assigned Contracts and Purchased Assets, or (ii) if the failure to effect a Transfer of any Consent Pending Contract listed on **Section 2.05(b)** of the Disclosure Schedules, terminate this Agreement as provided in **Article IX**.

(c)     Seller shall not reject (or move to reject) under section 365 of the Bankruptcy Code any Contract or Lease until after the Closing Date or the termination of this Agreement pursuant to **Article IX.** Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Lease is assumed and assigned to Buyer, such Contract or Lease shall be deemed an Assigned Contract.

**Section 2.06     Purchase Price.**  The aggregate purchase price for the Purchased Assets shall be paid in cash (the "**Cash Consideration**"), subject to adjustment pursuant to **Section 2.07** hereof (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities.  The Cash Consideration shall be paid as follows:

(a)     **Purchase Price Deposit.** Upon execution and delivery of this Agreement, Buyer shall deliver a deposit in the amount of 20% of the Qualified Bid (the "**Deposit**") in immediately available funds to Brennan, Manna & Diamond, LLC (the "**Deposit Agent**"), as escrow agent under an escrow agreement by and among Seller, Buyer and Deposit Agent (the "**Deposit Escrow Agreement**").  At Closing, the Deposit Agent shall deliver the Deposit to Seller, which shall be applied dollar-for-dollar toward payment of the Purchase Price.  The deposit shall be refundable if this Agreement is terminated pursuant to **Section 9.01(a), Section 9.01(b), Section 9.01(c), or Section 9.01(d)(ii)**; otherwise, the Deposit shall be nonrefundable.

(b)     On the Closing Date, the Cash Consideration, less the Deposit, shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer no later than two Business Days prior to the Closing Date.

(c)     On the Closing Date, the Escrow Amount shall be deposited by wire transfer of immediately available funds into an account designated by the Escrow Agent and shall be held and distributed in accordance with the terms of the Escrow Agreement to satisfy (i) any adjustments to the Purchase Price in favor of Buyer pursuant to **Section 2.07**; and (ii) any and all claims made by Buyer or any other Buyer Indemnitee against Seller pursuant to **Section 7.06**.

**Section 2.07     Purchase Price Adjustment.**

(a)     **Post-Closing Adjustment.**

(i)     Within 30 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of Closing Net Asset, which statement shall be substantially in the form of **Section 2.07(a)(i)** of the Disclosure Schedules and prepared using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Interim Balance Sheet (the "**Closing Net Asset Statement**").  The Closing Net Asset Statement shall include all Cure Costs calculated as of the Closing Date.

(ii)     The "**Post-Closing Adjustment**" shall be an amount equal to the Closing Net Asset value for Accounts Receivables and Inventory at closing less that equivalent balances as of the **Interim Balance Sheet**.  If the Post-Closing Adjustment is a positive number, Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment.  If the Post-Closing Adjustment is a negative number, Seller shall pay to Buyer an amount equal to the Post-Closing Adjustment, provided that any Post-Closing Adjustment requiring Seller to pay Buyer shall be limited to the Escrow Amount then held by the Escrow Agent.

(b)     **Examination and Review.**

(i)     After receipt of the Closing Net Asset Statement, Seller shall have 15 Business Days (the "**Review Period**") to review the Closing Net Asset Statement.  During the Review Period, Buyer shall cooperate and assist Seller, free of charge to Seller, in its review of the Closing Net Asset Statement and Seller and Seller's accountants shall have full access to the relevant books and records of Buyer, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants to the extent that they relate to the Closing Net Asset Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Net Asset Statement as Seller may reasonably request for the purpose of reviewing the Closing Net Asset Statement and to prepare a Statement of Objections (defined below), *provided, that* such access shall be in a manner that does not interfere with the normal business operations of Buyer.

(ii)     On or prior to the last day of the Review Period, Seller may object to the Closing Net Asset Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item, disputed amount and the basis for Seller's disagreement therewith (the "**Statement of Objections**").  If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Net Asset Statement and the Post-Closing Adjustment, as the case may be, reflected in the Closing Net Asset Statement shall be deemed to have been accepted by Seller.  If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 15 days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing Net Asset Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

(iii)     If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to the office of an impartial nationally recognized firm of independent certified public accountants appointed by mutual agreement (the "**Independent Accountants**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Net Asset Statement.  The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Net Asset Statement and the Statement of Objections, respectively.

(iv)     Seller and Buyer shall bear the fees and expenses of the Independent Accountants in equal portions.

(v)     The Independent Accountants shall make a determination as soon as practicable within thirty (30) days (or such other time as the Parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Net Asset Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the Parties hereto.

(vi)     Except as otherwise provided herein, any payment of the Post-Closing Adjustment shall (A) be due (x) within five (5) Business Days of acceptance of the applicable Closing Net Asset Statement or (y) if there are Disputed Amounts, then within five (5) Business Days of the resolution described in clause (v) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be.  Any payment of the Post-Closing Adjustment owed by Seller to Buyer shall be paid by the Escrow Agent from the Escrow Amount pursuant to the terms of the Escrow Agreement. The amount of any Post-Closing Adjustment shall bear no interest from the Closing Date to the date of payment.

(c)     **Adjustments for Tax Purposes.**  Any payments made pursuant to **Section 2.07** shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

**Section 2.08     Allocation of Purchase Price.**  Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all

13

purposes (including Tax and financial accounting) as shown on the allocation schedule (the "**Allocation Schedule**"). Buyer shall make commercially reasonable effort to prepare a draft of the Allocation Schedule in a manner consistent with Sections 338 and 1060 of the Code and the regulations thereunder, and deliver it to Seller within 30 days following the final determination of the Post-Closing Adjustment; *provided, however*, that Buyer may extend the time period within which to deliver such draft for another 15 days upon reasonable request of Buyer's accountants. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within 10 days after the delivery thereof, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within 45 days following the objection, such dispute shall be resolved by the Independent Accountants. The fees and expenses of such accounting firm shall be borne equally by Seller and Buyer. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

# ARTICLE III
# CLOSING

**Section 3.01    Closing.** Subject to the terms and conditions of this Agreement (including Sections 9.01(c)(iii) and 9.01(d)(ii)), the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Brenna, Manna & Diamond, LLC 75 East Market Street, Akron, Ohio, 44308, at 11:00 a.m., Eastern Standard Time, on the second Business Day after all of the conditions to Closing set forth in **Article VIII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 3.02    Closing Deliverables.**

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     the Escrow Agreement duly executed by Seller;

(ii)     a bill of sale substantially in the form of **Exhibit C** attached hereto and in form and substance reasonably satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property to Buyer;

(iii)     instruments of assignments for any Patents, Trademarks, Copyrights or Domain Names that are owned by Seller, transferrable and assignable by Seller and included in the Purchased Assets, duly executed by Seller in form for recordation with the appropriate Governmental Authorities, in form and substance satisfactory to Buyer, and any other assignments or instruments required to assign, transfer and convey to Buyer any and all right, title and interest of Seller in other Intellectual Property, to the extent such Intellectual Property is owned by Seller, transferable and assignable by Seller, and included in the Purchased Assets; and

(iv)     such other instruments and documents as may reasonably be required to give effect to this Agreement and the Sale Order.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Cash Consideration, less the Deposit and the Escrow Amount; and

(ii)     such other instruments and documents as may reasonably be required to give effect to this Agreement and the Sale Order.

(c)     At Closing, pursuant to section 365 of the Bankruptcy Code and the Sale Order, Seller shall assume and assign to Buyer, and Buyer shall consent to such assignment from Seller of, all of the Assigned Contracts (including the Leases).

14

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller hereby represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the date hereof and as of the Closing Date.

**Section 4.01     Organization and Qualification of Seller.**  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Ohio and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.  **Section 4.01** of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except where the failure to so qualify of be licensed or in good standing would not have or be a Material Adverse Condition.

**Section 4.02     Authorization and Validity.**  Subject to the Bidding Procedures Order and the Sale Order, Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to the Bidding Procedures Order and the Sale Order, the execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by each other party thereto) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by the Bidding Procedures Order, the Sale Order and bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.  When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by the Bidding Procedures Order, the Sale Order and bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.

**Section 4.03     No Conflicts; Consents.**  To Seller's Knowledge, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) except as provided in the Sale Order, conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach in any material respect of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) other than the Sale Order, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Assigned Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) except as provided in the Sale Order, result in the creation or imposition of any Encumbrance on the Purchased Assets (other than a Permitted Encumbrance).  Other than the Sale Order, to Seller's Knowledge, no other consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

15

**Section 4.04**     **Financial Statements.**  Complete copies of the unaudited financial statements consisting of the balance sheet of the Business as at June 30, 2017 and the related statements of income and retained earnings, stockholders' equity and cash flow for the year then ended (the "**Financial Statements**") have been delivered to Buyer.  The Financial Statements have been prepared on a consistent basis throughout the period involved.  The Financial Statements are based on the books and records of the Business, and, to the actual knowledge of Robert Kiggans (Company Controller), after due inquiry fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

**Section 4.05**     **Title to Purchased Assets.**  Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets, subject to Permitted Encumbrances.

# ARTICLE V
# REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the date hereof and as of the Closing Date.

**Section 5.01**     **Organization of Buyer.**  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of _____.

**Section 5.02**     **Authority of Buyer.**  Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.  When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.

**Section 5.03**     **No Conflicts; Consents.**  Subject to the Sale Order, the execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04**     **Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

Section 5.05      **Legal Proceedings.**  There are no Actions pending or threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred, or circumstances exist that may give rise or serve as a basis for any such Action.

Section 5.06      **Buyer Broker Fees.**  Neither Buyer nor any of its Representatives has paid or become obligated to pay any fee, commission or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable, and Buyer shall indemnify and hold harmless Seller from any claims with respect to any such fees, commissions or similar payments.

Section 5.07      **No Known Breach by Seller.**  Buyer is not aware of any facts or circumstance, which (with or without notice or lapse of time or both) would cause any representations or warranties of Seller to be untrue or incorrect in any respect.

Section 5.08      **Acknowledgement Purchased Assets Acquired "AS IS".**  Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) Buyer is purchasing the Purchased Assets on an "AS IS" basis and "WITH ALL FAULTS" based solely on Buyer's own investigation of the Purchased Assets and (b) neither Seller nor its Representatives has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets or the Assumed Liabilities, any part of the Purchased Assets or the Assumed Liabilities, relating to the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets.  Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Assets "AS IS" and "WITH ALL FAULTS".  Buyer confirms that Seller has made available to Buyer the opportunity to ask questions of the officers and management of Seller and to acquire additional information about the Business, the Purchased Assets and the Assumed Liabilities.  Buyer agrees, warrants, and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER MAKES NO EXPRESS WARRANTY, WARRANTY OF MERCHANTABILITY, WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

Section 5.09      **Availability of Funds.**  Buyer has as of the date hereof, and will have on the Closing Date, sufficient cash on hand or other sources of immediately available funds to enable Buyer to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

Section 5.10      **No Other Representations or Warranties of Seller**.

(a)      Except for the representations and warranties contained in **Article IV,** Buyer acknowledges that neither Seller nor its Representatives makes any other express or implied representation or warranty with respect to Seller or the Business (including representations and warranties as to the condition of the Purchased Assets).  No Seller nor any other Person will have or be subject to any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer, or use by Buyer of, any such information, including any information, documents, projections, forecasts or other material made available to Buyer in certain "data rooms", confidential information memoranda or management presentations in expectation of the transactions contemplated by this Agreement.

(b)      In connection with investigation by Buyer, Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that, except for the representations and warranties contained in **Article IV**

17

and subject to the terms and conditions hereof, Buyer shall have no claim against anyone with respect thereto. Accordingly, except for the representations and warranties contained in **Article IV**, Buyer acknowledges that Seller does not make and has not made any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

# ARTICLE VI
## ACTIONS PRIOR TO CLOSING DATE

Section 6.01        **Investigation of the Business by Buyer**.

(a)        From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Seller may be bound, upon reasonable notice, Seller shall afford Buyer's authorized Representatives reasonable access during normal business hours to the offices, properties, key employees, outside accountants, agreements and other documentation and financial and Tax records (including computer files, retrieval programs and similar documentation) with respect to the Business, the Purchased Assets and the Assumed Liabilities to the extent Buyer reasonably deems necessary, and shall permit Buyer and its authorized Representatives to make copies of such materials at Buyer's sole expense.  From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Seller may be bound, Seller shall furnish to Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable Buyer or its authorized Representatives to (i) verify the accuracy of Seller's representations and warranties contained in this Agreement, (ii) verify that Seller has complied with the covenants contained in this Agreement, (iii) determine whether the conditions set forth in **Article VIII** have been satisfied and (iv) estimate the Closing Net Asset.  From and after the date hereof until the Closing, Seller shall promptly furnish to Buyer a monthly financial statement of Seller within five Business Days after the end of each calendar month and the estimated Closing Net Asset Statement no later than ten Business Days prior to the Closing Date.  From and after the date hereof until the Closing, Seller shall use its commercially reasonable efforts to cause its outside accountants and outside counsel to cooperate with Buyer in such investigation.  It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Seller in this Agreement. Notwithstanding anything to the contrary herein, no such investigation or examination shall be permitted, and no such documents or information shall be required to be provided or made available, to the extent that it would require Seller to disclose documents or information subject to attorney-client privilege.  For the avoidance of doubt, nothing in this **Section 6.01** is intended to create a due diligence contingency in favor of Buyer.

(b)        From and after the date hereof until the Closing, as reasonably requested by Buyer from time to time, Seller shall use commercially reasonable efforts to cooperate with Buyer in connection with arranging such meetings or telephone conferences with material suppliers and customers of the Business as may be necessary and appropriate for Buyer to conduct a comprehensive review of Seller's relations with its customers and suppliers.

Section 6.02        **Operations Prior to the Closing Date.**  From the date hereof until the Closing, Seller shall use commercially reasonable efforts to (x) maintain the Purchased Assets and operate and carry on the Business only in the Ordinary Course of Business, taking into account Seller's status as a debtor in possession and subject to the availability of funding therefor, and except as otherwise expressly provided in this Agreement or in any orders of the Bankruptcy Court; and (y) maintain the business organization of the Business intact and to preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business.  In connection therewith, between the date hereof and the Closing, Seller shall not (i) offer employment for any period on or after the Closing Date to any employee or agent of the Business regarding whom Buyer makes offers of employment in accordance with the terms set forth herein, (ii) otherwise attempt to persuade any such employee or agent to

18

terminate his or her relationship with the Business, (iii) materially alter the terms of employment of any employee or agent of the Business, (iv) collect or settle Accounts Receivable, sell Inventory, or grant customer refunds, rebates, returns, or discounts other than in the Ordinary Course of Business, (v) incur additional assumed liabilities in excess of $25,000, or (vi) enter into or renew contracts for a period longer than one year.

**Section 6.03     Third Party Consents.** Subject to **Section 2.05**, from the date hereof until the Closing, Seller, on the one hand, and Buyer, on the other hand, will reasonably cooperate with the other to secure, before the Closing Date, all third party consents to the extent such consents are not provided for, or the need for which is not obviated or satisfied, by the Sale Order, *provided* that, subject to **Section 2.05**, neither Seller nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers (in the case of Seller, unless Buyer requests that Seller make such a payment or provide such other consideration and Buyer agrees to pay Seller or provide such other consideration in advance for such payment and any associated costs); *provided*, *however*, that neither Buyer nor Seller shall be required to waive any of the conditions to Closing set forth in **Article VIII**.

**Section 6.04     Governmental Approvals.**

(a)     From and after the date hereof until the Closing Date, Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Law to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them under non-United States antitrust or competition laws, in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in **Article VIII**, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; *provided, however*, that neither Seller nor Buyer shall make any agreement or understanding affecting the Purchased Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such consents or approvals except with the prior written consent of the other (which consent shall not be unreasonably withheld or delayed). Seller and Buyer shall act diligently and reasonably to cooperate with the other, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this **Section 6.04(a)**; *provided, however*, neither Seller nor Buyer shall be required to waive any of the conditions to Closing set forth in **Article VIII**.

(b)     Seller and Buyer: (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval; and (ii) shall permit each other to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, neither Seller nor Buyer shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, without consulting with each other in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each of Seller and Buyer shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Seller and Buyer shall also furnish each other with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Seller and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by a Governmental Order as soon as possible.

**Section 6.05    Non-competition.**  For a period of five (5) years commencing on the Closing Date, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business, or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

**Section 6.06    Notice of Developments.**  From the date hereof until the Closing, Seller shall promptly notify Buyer of, to Seller's Knowledge, (a) any change or development which would cause any of the representations and warranties in **Article IV** not to be true and correct in all material respects, or (b) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Seller under this Agreement.

# ARTICLE VII
# ADDITIONAL AGREEMENTS

**Section 7.01    Taxes.**

(a)    Except as specifically set forth herein (including **Section 7.01(a)**), Seller shall be liable for and shall pay, and pursuant to **Section 7.01(c)** shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date.  Without limiting the obligations of Buyer contained elsewhere in this Agreement (including **Section 7.01(a)**), Buyer shall be liable for and shall pay, and pursuant to **Section 7.01(c)** shall reimburse Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date.  For purposes of this **Section 7.01(a)**, any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)    Without limiting the other terms set forth in this Agreement, all Transfer Taxes shall be borne and paid by Seller as and when due.  Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; *provided, however,* that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and deliver to Buyer a copy of such Tax Return at least ten days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(c)    Seller or Buyer, as the case may be, shall provide reimbursement for any Taxes, all or a portion of which is the responsibility of such Party, paid by the other Party in accordance with the terms of this **Section 7.01**.  Within a reasonable time prior to the payment of any such Taxes, the Party paying such Taxes shall give notice to the other of the Taxes payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

**Section 7.02    Collections after Closing.**  If, after the Closing Date, Seller receives payment from any account debtor with respect to any Assigned Contract, within ten (10) Business Days after Seller's receipt thereof, Seller shall deliver all such funds and/or assets to Buyer and take all steps necessary to effectuate the transfer of such funds and/or assets to Buyer.  From and after the Closing, if Buyer receives or collects any funds relating to any Excluded Asset, within ten (10) Business Days after Buyer's receipt thereof,

Buyer shall deliver all such funds and/or assets to Seller and take all steps necessary to effectuate the transfer of such funds and/or assets to Seller.

**Section 7.03    Employee Matters.**

(a)    Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date and accept Buyer's offer of employment and commence working for Buyer on the Closing Date ("**Transferred Employees**"). Prior to the Closing, and except with respect to those employees listed in **Section 7.03(a)** of the Disclosure Schedules, which schedule shall not be subject to amendment or modification hereafter without the express written consent of Buyer, Buyer shall offer employment, on an "at-will" basis, to each of Seller's employees who remain employed by Seller immediately prior to the Closing and Seller's termination of such employees as provided above (the "**Eligible Employees**"), and all such offers of employment shall be at substantially the same annual rate of pay at which such employees were employed as of the Effective Date. For purposes of determining whether the rate of pay offered by Buyer is substantially similar, the Benefit Plan shall be disregarded. So long as offers of employment have been mailed or e-mailed by Buyer to all Eligible Employees prior to Closing, then Buyer shall be deemed to have satisfied its obligation to offer employment to the Eligible Employees prior to Closing. Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, salary, wages, bonus, commissions, vacation, severance and other employee payroll obligations (including accrued payroll Taxes), expenses and ordinary course benefits owing to Seller's employees as of the Closing Date (or that become owing to such employees upon the termination of their employment including all Liability arising under the WARN Act).

(b)    With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53m 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(c)    Other than as expressly set forth in this Agreement, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

**Section 7.04    Post-Closing Cooperation and Access to Books and Records.** For a period ending on the later of one (1) year after the closing of the Bankruptcy Case (or such longer period as may be required by any Governmental Authority or ongoing claim):

(a)    Buyer shall not dispose of or destroy any of the business records and files of the Business held by Buyer or any of its Affiliates or Representatives and relating to the period preceding the Closing Date.

(b)    Each Party (the "**Requested Party**") shall allow any other Party (including, for clarity, any trust established under a chapter 11 plan of Seller or any other successors of Seller) and any of their directors, officers, employees, counsel, representatives, accountants and auditors, at such other Party's sole cost and expense but otherwise free of charge to such other Party, reasonable access during normal business hours (which shall include an office at the Akron Facility for Seller, its Representatives or any successor or designated bankruptcy estate representative), and upon reasonable advance notice, to all employees (including the assistance of such employees as described below) and files (including Tax related files) of the Requested Party and any books and records and other materials included in the Purchased Assets relating to periods prior to the Closing Date; *provided*, *however*, that Seller and Buyer will be required to sign a non-disclosure agreement, if reasonably requested by Buyer or Seller or any successor or designated bankruptcy estate representative, prior to Buyer or Seller or any successor or designated bankruptcy estate representative's provision of information to Seller or any successor or designated bankruptcy estate representative or Buyer, respectively, that constitutes a trade secret, or is otherwise confidential or proprietary in nature.

**Section 7.05          Post-Closing Tax Returns.**  Buyer hereby covenants that it will reasonably cooperate and assist Seller in the preparation and filing of all necessary Tax Returns of Seller that are required to be filed following the Closing Date; *provided*, *however* that any costs and expenses with respect to the preparation and filing of any such Seller Tax Returns shall be borne by Seller; *provided*, *further*, *however*, that, except as expressly set forth in this Agreement, Buyer shall have no liability with respect to Taxes payable in connection with such Seller Tax Returns, and Buyer shall have no liability with respect to such Seller Tax Returns other than in connection with the willful or intentional misconduct of Buyer.

**Section 7.06          Indemnification by Seller.**  Only to the extent of the Escrow Amount held by the Escrow Agent, Seller shall indemnify and defend Buyer and its Affiliates and their Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all damages and losses (including, fines, penalties, cost and expenses, including reasonable attorneys' fees) incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date; (b) any breach of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement; (c) any Excluded Asset or any Excluded Liability; or (d) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller or any of its Affiliates (other than the Purchased Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date.

**Section 7.07          Indemnification by Buyer.**  Buyer shall indemnify and defend Seller and its Affiliates and their Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all damages and losses (including, fines, penalties, cost and expenses, including reasonable attorneys' fees) incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date; (b) any breach of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement; (c) any Purchased Asset or any Assumed Liability~;~ or (d) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Buyer or any of its Affiliates (other than the Excluded Assets or Excluded Liabilities) conducted, existing or arising after the Closing Date.

**Section 7.08          Limitations to Indemnification.**  Seller's maximum liability to the Buyer Indemnitees for indemnification under **Section 7.06**, and Buyer's maximum liability to the Seller Indemnitees for indemnification under **Section 7.07**, shall not exceed the Escrow Amount then held by the Escrow Agent. Seller shall not be liable to the Buyer Indemnitees for indemnification under **Section 7.06(a)** and **Section 7.06(b)** until the aggregate amount of all losses in respect of indemnification under such sections exceeds [$30,000], in which event Seller shall be required to pay or be liable for all such losses from the first dollar but shall not exceed the Escrow Amount then held by the Escrow Agent.

**Section 7.09          Indemnification Procedure.**  Whenever any claim shall arise for indemnification hereunder, the Party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other Party (the "**Indemnifying Party**").  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party.  The Indemnified Party shall be entitled to participate in the defense of any such Action,

22

with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

Section 7.10 **Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the Parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

Section 7.11 **Waiver of Bulk Sales Act.** Buyer hereby waives compliance with the provisions of any Bulk transfer laws.

Section 7.12 **Further Assurances.** Following the Closing, Seller and Buyer shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

# ARTICLE VIII
# CONDITIONS TO CLOSING

Section 8.01 **Bankruptcy Conditions.** The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following conditions:

(a) <u>Approval of Bidding Procedures</u>. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, an "**Alternative Transaction**"). Prior to seeking approval of the sale of the Purchased Assets, Seller shall seek the Bankruptcy Court's approval of the Bidding Procedures Order, which shall include the following procedures and for the submission and consideration of qualified bids, along with such other bidding procedures consistent herewith as determined by Seller to be appropriate:

(i) In order for a bid to be determined as qualified (each, a "**Qualified Bid**"), must be:

(A) in writing;

(B) received by Seller and Buyer at their respective addresses set forth in **Section 10.04** no later than the deadline for submitting an Alternative Transaction established by the Bidding Procedures Order (the "**Bid Deadline**");

(C) a firm, unconditional bid to purchase the Purchased Assets, not subject to any contingencies as to the validity, effectiveness and/or binding nature of the offer, including, without limitation, further due diligence review or financing;

(D) accompanied by sufficient information to demonstrate that the competing bidder has the financial wherewithal and ability to timely consummate the acquisition of the Purchased Assets on terms and conditions substantially the same as this Agreement, including evidence of adequate financing and a financial guaranty, if appropriate;

(E) accompanied by a signed contract substantially in the form of this Agreement, and marked to show any changes made to this Agreement;

23

(F)                    accompanied by a good faith cash Deposit, to be deposited with Seller (or an escrow agent) on or before the Bid Deadline.

(G)                    is a bid for the Assets as a package, and NOT a bid for a portion of the Assets

(H)                    is a binding irrevocable offer to purchase the Assets for cash only, with no contingencies to closing (other than the conditions set forth in this Agreement);

(I)                    states the bidder's intention regarding the Pension Plan;

(J)                    states the bidder's intention regarding hiring/future retention of a substantial portion of the Debtor's existing production and maintenance employees;

(K)                    the bid must not be materially more burdensome or conditional than the terms of this Agreement;

(L)                    the bidder must establish that, in the Debtor's business judgment, the bidder has the ability and is reasonably likely to timely close on its proposed acquisition of the Assets if selected as the High Bid;

(M)                    is not subject to or conditioned on obtaining financing;

(N)                    is not conditioned on the outcome of unperformed due diligence;

(O)                    does not entitle the bidder, to any termination or break-up fee, expense reimbursement, or similar type of payment;

(P)                    is a good faith, bona fide offer to purchase the Assets;

(Q)                    is a Qualified Bid acceptable to the Debtor;

(R)                    by its terms will remain open and irrevocable as set forth in Bidding Procedures until the earlier of: (i) the closing with respect to the High Bid or the High Back-Up Bid, as applicable; or (ii) 90 days after entry of the Order of the Bankruptcy Court approving the sale;

(S)                    contains evidence satisfactory to the Debtor that the bidder is reasonably likely to obtain prompt regulatory approval, if required, to purchase the Assets; and

(T)                    is an amount of no less than $1,500,000.00 (the "Minimum Bid Amount").


(i)     Seller shall evaluate all Qualified Bids received and shall determine which Qualified Bid reflects the highest or best offer as the Starting Auction Bid for the Purchased Assets. Seller shall announce its determination of the Starting Auction Bid at the commencement of the Auction;

(ii)    The first incremental competitive bid at the Auction shall be at least $10,000 in excess of the Starting Auction Bid, with any subsequent increases of bids to be made in increments of at least $5,000;

(iii)   No bids shall be considered by Seller unless a party submitted a Qualified Bid and participates in the Auction;

(iv)    All of the Purchased Assets shall be sold in a single lot;

(v)     If Seller desires to select a bid from an entity other than Buyer that Buyer believes is not the highest or best bid, the Bankruptcy Court shall determine which is the successful bidder;

(vi)    If the highest bidder at the auction fails to consummate the transaction, Seller shall be obligated to consummate the transaction with next highest bidder, on the terms of this Agreement, except for the purchase price, which shall equal the purchase price of the next highest bid that was submitted to Seller during the Auction; and

(vii)    In the event that Seller determines in good faith that it has not received a Qualified Bid by the Bid Deadline, Seller shall seek approval of this Agreement at the Sale Hearing without conducting an Auction and without further motion.

(c)    Solicitation. Until the transaction contemplated by this Agreement and approved by the Sale is consummated, Seller and its Representatives are permitted to initiate or continue contact with, solicit, or encourage submission of bids, inquiries, offers and proposals by, any Person other than Buyer in connection with any sale or other disposition of the Purchased Assets. In addition, Seller may respond to all inquiries, bids, offers and proposals from any such Person for all or part of the Purchased Assets and shall perform any and all acts related thereto required under the Bankruptcy Code or other applicable law, including, without limitation, providing information relating to the Business and the assets of Seller to other prospective purchasers.

(d)    Entry of Sale Order. Within sixty (60) days after the Petition Date, unless extended by agreement of Seller and Buyer, the Bankruptcy Court shall have entered a final order (the "**Sale Order**"), substantially in the form of **Exhibit D** attached hereto, which among other things, pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)    approves this Agreement and authorizes the sale of the Purchased Assets by Seller to Buyer on the terms set forth herein;

(ii)    provides that the sale of the Purchased Assets vests Buyer with all right, title and interest of Seller in, to and under the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances, if any), and on an "AS IS" and "WHERE IS" basis, without any representations or warranties of any kind (including no representations or warranties as to merchantability, fitness or use) other than those specifically set forth in this Agreement;

(iii)    finds that Buyer has provided adequate assurance of future performance under the Assigned Contracts and otherwise approves the assumption of the Assigned Contracts and assignment to Buyer;

(iv)    establishes the amount of the Cure Costs to be paid in accordance with this Agreement;

(v)    finds that Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and is entitled to the protections thereof;

(vi)    finds that the sale of the Purchased Assets to Buyer pursuant to the terms of this Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the states in which Seller is incorporated and any other applicable non-bankruptcy laws;

(vii)    enjoins all Persons from taking any actions against Buyer or its affiliates to recover any claim which such Person has solely against Seller;

(viii)    provides that the obligations of Seller relating to Taxes, whether arising under law, by this Agreement, or otherwise, shall be fulfilled by Seller;

(ix)    provides that the provisions of the Sale Order are non-severable and mutually dependent;

(x)    provides that Buyer will not have any successor or transferee liability for liabilities of Seller (whether under federal or state law or otherwise) as a result of the sale of the Purchased Assets and assumption of the Assumed Liabilities; and

(xi)    authorizes Seller to execute such other documents and instruments and take such other actions as may be reasonably necessary or appropriate to allow the consummation of the transactions contemplated hereby.

(e)    Bankruptcy Court Approval.

(i)    Seller has filed with the Bankruptcy Court, the Bidding Procedures Motion and the Sale Motion. On January ___, 2018, the Bankruptcy Court approved the Motion establishing the bidding procedures upon which this contemplated sale shall be implemented. A copy of the Bidding Procedures Motion and Order is attached as Exhibit A. Buyer consents to these procedures and agrees to be bound by the

procedures approved by the Bankruptcy Court.(ii)  Seller shall cooperate with Buyer and its Representatives in connection with the Sale Order, the Bidding Procedures Order, and the bankruptcy proceedings in connection therewith.  Such cooperation shall include consulting with Buyer at Buyer's reasonable request concerning the status of such proceedings and providing Buyer with copies of pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  Seller further covenants and agrees that the terms of any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms this Agreement, or in any way prevent or interfere with the consummation or performance of the transaction contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Bidding Procedures Order or the Sale Order.

(iii)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders.

(iv)     Buyer acknowledges that it is Buyer's obligation to provide adequate assurance of future performance of the Assigned Contracts (including the Leases) to the extent necessary under section 365 of the Bankruptcy Code and, notwithstanding anything to the contrary herein, that Seller shall not be obligated to assume and assign any Assigned Contract (including any Lease) with respect to which Buyer fails to satisfy the applicable counter party or the Bankruptcy Court as to adequate assurance of future performance (collectively, if any, the "**Non-Assured Contracts**") and Buyer's obligation to close the transactions contemplated herein shall not be conditioned upon the transfer and assignment to Buyer of any such Non-Assured Contracts.

(v)     Seller and Buyer shall cooperate in taking such other reasonable actions as necessary or appropriate to expeditiously obtain a Sale Hearing and entry of the Sale Order.

**Section 8.02          Conditions to Obligations of Buyer.**  In addition to the conditions set forth in **Section 8.01**, the obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver (which shall be in writing), at or prior to the Closing, of each of the following conditions:

(a)     The Bankruptcy Court shall have entered the Bidding Procedures Order no later than twenty-five (25) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Bidding Procedures Order shall be in effect at any time thereafter, and no appeal, motion for reconsideration, motion for stay pending appeal, or any other request for review of or relief from the Sale Order shall be pending.

(b)     The Bankruptcy Court shall have entered the Sale Order no later than sixty (60) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(c)     The representations and warranties of Seller set forth in this Agreement were true and correct in all material respects when made and as of the Closing Date.

(d)     Seller shall have performed and complied in all material respects with all agreements, covenants and conditions set forth in this Agreement.

(e)     No Governmental Order shall have been enacted, issued, promulgated, enforced or entered which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

(f)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents and such other documents and deliveries set forth in **Section 3.02(a)**.

(g)     All approvals, consents and waivers of third parties (including those from Governmental Authorities) for Consent Pending Contracts that are listed on **Section 2.05(b)** of the Disclosure Schedules shall

have been received, executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing, and no such approval, consent and waiver shall have been revoked, except to the extent the Bankruptcy Court permits or authorizes any Consent Pending Contract to be Transferred to Buyer without such consent.

(h)     From the date of this Agreement, there shall not have occurred any Material Adverse Condition caused by any Extraordinary Event, nor shall any Extraordinary Event or Events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Condition.

(i)     Seller shall have delivered to Buyer such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 8.03        Conditions to Obligations of Seller.**  In addition to the conditions set forth in **Section 8.01**, the obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver (which shall be in writing), at or prior to the Closing, of each of the following conditions:

(a)     The Bankruptcy Court shall have entered the Bidding Procedures Order no later than twenty-five (25) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Bidding Procedures Order shall be in effect at any time thereafter.

(b)     The Bankruptcy Court shall have entered the Sale Order no later than sixty (60) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(c)     The representations and warranties of Buyer set forth in this Agreement were true and correct in all material respects when made and as of the Closing Date.

(d)     Buyer shall have performed and complied in all material respects with all agreements, covenants and conditions set forth in this Agreement.

(e)     No Governmental Order shall have been enacted, issued, promulgated, enforced or entered which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

(f)     Buyer shall have delivered to Seller, duly executed counterparts to the Transaction Documents and such other documents and deliveries set forth in **Section 3.02(b)**.

(g)     Buyer shall have paid all Cash Consideration pursuant to **Section 2.06** (including delivery of the Deposit to the Deposit Agent pursuant to **Section 2.06(a)**).

(h)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

# ARTICLE IX
# TERMINATION AND OTHER REMEDIES

**Section 9.01        Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer.

(b)     by either Seller or Buyer by written notice to the other if:

(i)     the Bidding Procedures Order (or any portion thereof) is not granted by the Bankruptcy Court within twenty-five (25) days after the Petition Date, for any reason;

(ii)     the Sale Order is not entered by the Bankruptcy Court within sixty (60) days after the Petition Date; *provided, however*, that the right to terminate this Agreement under this **Section 9.01(b)(ii)** shall

27

not be available to either Party whose failure (or in the case of a Seller as the terminating Party, any Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Sale Order to have been entered on or prior to such date;

(iii)     the Closing shall not have occurred within thirty (30) days following the Sale Hearing; *provided, however*, that the right to terminate this Agreement under this **Section 9.01(b)(iii)** shall not be available to either Party whose failure (or in the case of Seller as the terminating Party, Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to have occurred on or prior to such date; or

(iv)     a Governmental Order has been enacted, issued, promulgated, enforced or entered which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement, including for the avoidance of doubt, entry of a Sale Order approving an Alternative Transaction.

(c)     by Buyer by written notice to Seller if:

(i)     there has occurred, or will occur, any Material Adverse Condition caused by any Extraordinary Event, including as a result of the failure to effect a Transfer of an Assigned Contract or Non-Assured Contract;

(ii)     there has been a material breach by Seller of any of Seller's agreements, covenants, representations or warranties set forth herein or in the Sale Order or the Bidding Procedures Order and Seller has failed to cure such breach within ten (10) Business Days after receipt of a Buyer Termination Notice; *provided, however*, that Buyer (x) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Sale Order or Bidding Procedures Order, (y) notifies Seller in writing (the "**Buyer Termination Notice**") of its intention to exercise its rights under this Agreement as a result of the breach, and (z) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Sale Order or Bidding Procedures Order of which Seller is allegedly in material breach;

(iii)     the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by this Agreement;

(iv)     any of the closing conditions set forth in **Section 8.01** and **Section 8.02** has not been satisfied, or if it becomes apparent that any such conditions will be impossible to satisfy, by June 30, 2014 (or such earlier date on which the condition is required to be satisfied) unless such failure is due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied in any material respect with by Buyer prior to the Closing; or

(d)     by Seller by written notice to Buyer if:

(i)     there has been a material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties set forth herein or in the Bidding Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within ten (10) days after receipt of the Seller Termination Notice specified in this subsection; *provided, however*, that Seller (x) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (y) notifies Buyer in writing (the "**Seller Termination Notice**") of its intention to exercise its rights under this Agreement as a result of the breach, and (z) specifies in such Seller's Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bidding Procedures Order or the Sale Order of which Buyer is allegedly in material breach; or

(ii)     any of the closing conditions set forth in **Section 8.01** and **Section 8.03** has not been satisfied, or if it becomes apparent that any such conditions will be impossible to satisfy, by June 30, 2014 (or such earlier date on which the condition is required to be satisfied) unless such failure is due to the failure of

28

Seller to perform or comply in any material respect with any of the covenants, agreements or conditions hereof to be performed or complied with by Seller prior to the Closing.

**Section 9.02    Effect of Termination.**  In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of either Party to any other Party.  The provisions of this Agreement shall forthwith become void except:

(a)    as set forth in this **Article IX** and **Article X**;

(b)    that nothing herein shall relieve either Party from liability for any willful breach of any provision hereof; and

(c)    in the event of a termination pursuant to this **Article IX** (other than pursuant to **Section 9.01(d)(i)**), Seller shall cause the Deposit Agent to promptly return the Deposit to Buyer.

# ARTICLE X
# MISCELLANEOUS

**Section 10.01    Confidential Nature of Obligations.**  The following paragraph is subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court or as Seller may reasonably deem necessary or appropriate in order to facilitate the transactions contemplated herein.

Buyer and Seller each agree that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other Party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing Party, will return to the other Party all copies of nonpublic documents and materials which have been furnished in connection therewith.  Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Seller's counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential).  No other Party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets; *provided, however*, that after the Closing, any confidential information included in the Purchased Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and Seller shall maintain the confidentiality thereof in accordance with this **Section 10.01**.  The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such Party from a source other than the disclosing Party, (ii) is or becomes available to the public other than as a result of disclosure by such Party or its agents or (iii) is required to be disclosed under applicable law or judicial process (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed.  Notwithstanding clause (iii) of the preceding sentence, in the event that either Party is required to disclose any confidential information by applicable law, judicial process or rule of any national securities exchange, it is agreed that the Party subject to such requirement will provide the other Party with prompt notice of such requirement and such Party may seek an appropriate protective order if it so desires.

**Section 10.02    Survival.**  The representations and warranties of Seller and Buyer contained in this Agreement shall survive the Closing Date for three (3) months after the Closing Date.  Unless otherwise stated in this Agreement, all covenants and undertakings of Seller and Buyer contained herein shall survive the Closing for three (3) months after the Closing Date.

**Section 10.03    Expenses.**  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, any fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, subject to Bankruptcy Court approval where required, whether or not the Closing shall have occurred.

29

Section 10.04    **Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this **Section 10.04**):

If to Seller:

> **The R.C.A. Rubber Company**
> c/o Charles Deutchman
> Financial Consultant
> Shared Management Resources, Ltd.
> 28026 Gates Mills Blvd
> Pepper Pike, OH 44124-4730
>
> E-mail: cdeutchman@shrmgtres.com
> Attention: Chief Restructuring Officer

with a copy to:

> **Brennan, Manna and Diamond, LLC**
> c/o Michael A. Steel
> 75 East Market Street
> Akron, Ohio 44308
>
> E-mail: masteel@bmdllc.com

If to Buyer:

> **Buyer's Name**_____
> Street Address _____
> City, State and Zip Code _____
>
> E-mail: _____
> Attention: _____

with a copy to:

> **Buyer's Law Firm** _____
> Street Address _____
> City, State and Zip Code _____
>
> E-mail: _____
> Attention: _____

Section 10.05    **Interpretation**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.  Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and

30

includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

Section 10.06    **Headings.**    The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Article," "Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement.

Section 10.07    **Severability.**    If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 10.08    **Entire Agreement.**    This Agreement (including the Disclosure Schedules and the Exhibits hereto) and the other Transaction Documents constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 10.09    **Assignment.**    This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by either Party hereto by operation of law or otherwise without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such other Party); *provided, however*, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Agreement.

Section 10.10    **No Third-Party Beneficiaries.**    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

Section 10.11    **Amendment and Modification; Waiver.**    This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by either Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.12    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Ohio without giving effect to any choice or conflict of law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Ohio.

(b)     THE PARTIES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OHIO FOR ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 10.13     Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.14     Time of Essence.**  Time is of the essence in this Agreement.

**Section 10.15     Disclosure Schedules.**  The Disclosure Schedules of Seller are qualified in their entirety by reference to the specific provisions of this Agreement and are not intended to constitute, and shall not be construed as constituting, representations or warranties of Seller, except as and to the extent provided in this Agreement.  In no event shall any disclosure of such additional matters be deemed or interpreted to broaden or otherwise amend any of the covenants or representations or warranties in this Agreement.

**Section 10.16     No Recourse.**  No past, present or future director, officer, manager, employee, incorporator, member, partner, stockholder, agent, attorney or representative of the respective Parties to this Agreement, in such capacity (any such Person in such capacity, a "**Non-Recourse Party**"), shall have any liability or obligation with respect to this Agreement or the transactions contemplated hereby, or with respect to any claim or cause of action that may arise out of this Agreement or the transactions contemplated hereby, or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby; in each case except for any claim or cause of action against a Non-Recourse Party (i) arising out of or in connection with the fraud, bad faith or willful misconduct of such Non-Recourse Party, including in connection with this Agreement or any other Transaction Document, or (ii) otherwise expressly permitted to be brought against a Non-Recourse Party pursuant to any other Transaction Document, as applicable.  For the avoidance of doubt, nothing in this Section is intended to or shall be deemed to in any way limit or affect any rights of Seller with respect to any Avoidance Claims or Actions relating thereto, or any other claims against any person arising out of actions or conduct of such person arising prior to or outside the context of this Agreement.

*Signatures on Next Page.*

32

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

**THE R.C.A. RUBBER COMPANY**

By: _____
Name:
Title:

**BUYER:**

_____Company

By: _____
Name:
Title:

# EXHIBIT "A"

## BIDDING PROCEDURES MOTION AND ORDER

TO BE ATTACHED

2

# EXHIBIT "C"

## Bill of Sale

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, The R.C.A. Rubber Company, a Ohio corporation ("**Seller**"), pursuant to, and to the extent authorized in, the authorization contained in the Order (A) Approving Asset Purchase Agreement And Authorizing Sale Of Assets Outside The Ordinary Course Of Business, (B) Authorizing The Sale Of Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests Pursuant To Sections 363(b), (f) And (m) Of The Bankruptcy Code, (C) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, and (D) Granting Related Relief entered on _____, 2018 by the United States Bankruptcy Court for the District of Ohio, does hereby grant, bargain, transfer, sell, assign, convey and deliver to [BUYER NAME], a [STATE OF ORGANIZATION] corporation ("**Buyer**"), all of its right, title and interest in and to the Tangible Personal Property, as such term is defined in the Asset Purchase Agreement, dated as of _____, 2018  (the "**Purchase Agreement**"), by and between Seller and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of [DATE].

# EXHIBIT "D"

## Sale Order

TO BE ATTACHED

Section 2.01(a) of the Disclosure Schedule

# <u>PERMITTED ENCUMBRANCES</u>

NONE

Section 2.01(a)(iii) of the Disclosure Schedule

# Contracts, Leases and Intellectual Property Licenses

TO BE ATTACHED

# INTELLECTUAL PROPERTY ASSETS

TO BE ATTACHED

# TANGIBLE PERSONAL PROPERTY

# TO BE ATTACHED

Section 2.01(a)(vii) of the Disclosure Schedule

# <u>OWEND AND LEASED REAL PROPERTY</u>

<u>**TO BE ATTACHED**</u>

Schedule 2.01(a)(ii)

# PERMITS (including EVIORNMENTAL PERMITS)

**Section 2.02 of the Disclosure Schedule**

# <u>EXCLUDED ASSETS</u>

NONE

Schedule 2.02

Section 2.03 of the Disclosure Schedule

# ASSUMED LIABILITIES

NONE

**Schedule 2.03**

Section 2.07(a)(i) of the Disclosure Schedule

# NET ASSET CALCULATION

# **MATERIAL CONTRACTS**

TO BE ATTACHED

Section 4.01 of the Disclosure Schedule

# JURISDICTIONS

**TO BE ATTACHED**

Schedule 4.01

**Section 7.03 of the Disclosure Schedule**

## <u>EXCLUDED EMPLOYEES</u>

NONE